JTW: 10.27.21



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | | |
|---|---|---|---|
| Dana Brusca<br>Assistant United States Attorney<br>Dana.Brusca@usdoj.gov | Mailing Address:<br>6500 Cherrywood Lane, Suite 200<br>Greenbelt, MD 20770-1249 | Office Location:<br>6406 Ivy Lane, 8th Floor<br>Greenbelt, MD 20770-1249 | DIRECT: 301-344-0222<br>MAIN: 301-344-4433<br>FAX: 301-344-4516 |

November 1, 2021

Gerald Ruter, Esq.
9411 Philadelphia Road, Suite O
Baltimore, MD 21237

Gary Proctor, Esq.
8 E Mulberry Street
Baltimore, MD 21202

Re: United States v. Kiara Haynes
Criminal No. RDB-20-139

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Kiara Haynes (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **November 8, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1. The Defendant agrees to plead guilty to Counts Four and Five of the Second Superseding Indictment pending against her, which charge the Defendant with aiding and abetting the use and discharge of a firearm during and in relation to a drug trafficking crime and crime of violence (Hobbs Act robbery), resulting in the death of Jennifer Jeffrey and K.B., respectively. Both counts of conviction are in violation of 18 U.S.C. §§ 924(j), 924(c) and 2. The Defendant admits that the Defendant is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offenses

2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Second Superseding Indictment, in the District of Maryland, the Defendant:

1

a. knowingly used and discharged—or aided and abetted the use and discharge of—a firearm;

b. did so during and in relation to both a drug trafficking crime and a crime of violence that could be prosecuted in court of the United States—that is, conspiracy to distribute and possess with the intent to distribute heroin, in violation of 21 U.S.C. § 846, and robbery affecting interstate commerce (Hobbs Act robbery), in violation of 18 U.S.C. § 1951;

c. caused the death of another through the use and discharge, or aiding and abetting the use and discharge, of the firearm;

d. that the death caused constitutes murder as defined in Title 18, United States Code, Section 1111(a).

Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Counts | Statute | Mandatory Minimum Prison | Maximum Prison | Maximum Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 4 & 5 | 18 U.S.C. § 924(j)/(c) | 10 years | Life | 5 years | $250,000 | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is

2

nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

Waiver of Rights

4.   The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

  a.   If the Defendant had pled not guilty, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

  b.   If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

  c.   If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

  d.   The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

  e.   If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that:

a. The applicable base offense level for both Counts Four and Five is **43** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2A1.1 because the Defendant caused the death of another through the use of a firearm during a drug trafficking crime and a robbery affecting interstate commerce, and the death was first degree murder.

4

  b. The offense level for Count Five is increased by **2** pursuant to U.S.S.G. § 3A1.1(b)(1) because the Defendant knew or should have known that the victim of Count Five was a vulnerable victim.

  c. The offense level for both Counts Four and Five is increased by **2** pursuant to U.S.S.G. § 3C1.1 because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offenses of conviction, and the obstructive conduct related to the Defendant's offenses of conviction.

  d. Counts Four and Five do not group. U.S.S.G. §3D1.2(d). Hence, the adjusted offense level for Count Four is **45** and for Count Five is **47**.

  e. By application of the Multiple Count rules, Count Five is increased by two levels because Count Four is one to four levels less serious than Count Five. U.S.S.G. § 3D1.4. Thus, the final adjusted offense level before acceptance of responsibility is **49**. However, an offense level of more than 43 is treated as an offense level **43**. U.S.S.G. § 5 part A, n.2.

  f. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office will make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease based on timely acceptance of responsibility. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any

appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Second Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

    b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        i. The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

        ii. This Office reserves the right to appeal any sentence below a statutory minimum.

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses, which the Defendant agrees is at least $325.

12. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture

at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

13. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Restitution

15. The Defendant agrees to the entry of a Restitution Order for the full amount of the losses suffered by the victims identified in Attachment A. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that she will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil

proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

18.   The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19.   This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

Dana J. Brusca
Sandra Wilkinson
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11-8-21
Date

Kiara Haynes

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

11-16-21
Date

Gerald Ruter, Esq.

11-8-21
Date

Gary Proctor, Esq.

9

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

At all relevant times below, Kiara **HAYNES**, age 36, was a resident of Baltimore, Maryland.

As detailed below, on May 26, 2015, **HAYNES** helped her cousin, Andre **BRISCOE** (a/k/a "Poo") plan to rob **HAYNES**'s long-time friend, Jennifer Jeffrey, of heroin. During that robbery, which occurred on May 27, 2015, **BRISCOE** stole approximately $8,000 worth of heroin from Jeffrey and shot and killed Jeffrey and her 7-year old son, the Minor Victim. **HAYNES** provided **BRISCOE** the gun for the robbery, knew that **BRISCOE** intended to harm Jeffrey and her son, and assisted **BRISCOE** after the robbery and murders.

\* \* \*

**HAYNES** met Jeffrey when both Jeffrey and **HAYNES** were teenagers. At times during their friendship—and from at least February 2015 and continuing periodically to May 2015—**HAYNES** unlawfully purchased Percocet from Jeffrey, who had a prescription for the pills.

In the early months of 2015, **HAYNES** learned that Co-Conspirator 1 was occasionally staying in the basement of Jeffrey's home. Based on **HAYNES**'s personal observations and conversations with Jeffrey, **HAYNES** knew that Co-Conspirator 1 trafficked in heroin.

On or about February 14, 2015, **HAYNES** met **BRISCOE** at a party in Baltimore, Maryland. At the party, **HAYNES** and **BRISCOE** learned that they were cousins,[1] though they had never previously met. **BRISCOE** was accompanied to the party by a female, "Girlfriend 1."

After their initial meeting, **HAYNES** and **BRISCOE** saw one another approximately 4-5 times in Baltimore, including at **HAYNES**'s residence. During this period, which was only a few weeks, **HAYNES** understood that **BRISCOE** lived in Baltimore, but **HAYNES** did not know **BRISCOE**'s address. In February or March 2015, **BRISCOE** told **HAYNES** that **BRISCOE** was moving to Cambridge, Maryland. **HAYNES** understood that **BRISCOE** was moving to Cambridge to get involved in dealing heroin with his family members.

On March 21, 2015, Jeffrey married her son's father, who was then incarcerated. The week before the marriage, **HAYNES** and Jeffrey travelled together to Cambridge, Maryland so that Jeffrey could have a "bachelorette" party. During this trip, Jeffrey met **HAYNES**'s extended family members including **BRISCOE** and **BRISCOE**'s first cousin, Co-Conspirator 2. Shortly thereafter, **HAYNES** began a romantic relationship with **BRISCOE**; Jeffrey, in turn, began a romantic relationship with Co-Conspirator 2.

---

[1] **BRISCOE**'s father was a first cousin to **HAYNES**'s father.

10

In or about April 2015, **HAYNES** became aware that Jeffrey had introduced Co-Conspirator 1 to Conspirator 2, so that Co-Conspirator 1 could start supplying Co-Conspirator 2 with heroin. Co-Conspirator 1 and Jeffrey subsequently provided heroin to Co-Conspirator 2. Jeffrey and **HAYNES** travelled together from Baltimore to Cambridge, Maryland several times a week so that Jeffrey could provide Co-Conspirator 2 with heroin.

Co-Conspirator 2 and **BRISCOE** also frequently visited Jeffrey and **HAYNES** in Baltimore. Whenever **HAYNES** saw Co-Conspirator 2 connect with Co-Conspirator 1 for the purpose of obtaining heroin, **BRISCOE** was present.

At the beginning of May 2015, **HAYNES** and Jeffrey had a falling out, in part, because Jeffrey was pressuring **HAYNES** to pay $20 that **HAYNES** owed Jeffrey for a Percocet. At the time, **HAYNES** had little money and had seen Jeffrey making large sums of cash from Jeffrey's drug trafficking activities with **HAYNES's** cousins. After paying Jeffrey the $20, **HAYNES** largely stopped talking to Jeffrey. Around this same time, Jeffrey's relationship with Co-Conspirator 2 also began to cool.

On or about May 12, 2015, Co-Conspirator 1 was arrested. As part of an effort to help Co-Conspirator 1 raise money for bail, Jeffrey asked **BRISCOE** and Co-Conspirator 2 to help her sell heroin that she was holding.

Around this same time, **BRISCOE** let **HAYNES** know that **BRISCOE** was coming to Baltimore (from Cambridge) to purchase a new phone. **BRISCOE** asked to stay at **HAYNES's** apartment while **BRISCOE** was in town.

On May 26, 2015, in the morning or early afternoon, **BRISCOE** arrived at **HAYNES's** apartment. After **BRISCOE** arrived, **HAYNES** and **BRISCOE** went to the MetroPCS store so that **BRISCOE** could buy a new phone. **HAYNES** and **BRISCOE** then went to Girlfriend 1's apartment.

While at Girlfriend 1's apartment, **HAYNES** overheard a phone call between **BRISCOE** and Jeffrey. Jeffrey asked **BRISCOE** if **BRISCOE** still wanted Jeffrey to drive **BRISCOE** back to Cambridge on May 27, 2015. Upon hearing the call, **HAYNES** became angry. **BRISCOE** approached **HAYNES** and, to calm **HAYNES** down, explained that Jeffrey had heroin and that he, **BRISCOE**, was planning to rob and kill Jeffrey. **BRISCOE** confirmed to **HAYNES** his intention to kill not only Jeffrey but also the Minor Victim if the Minor Victim were present at the time of the robbery. **HAYNES** offered to help **BRISCOE** obtain a gun.

After the conversation with **BRISCOE**, **HAYNES** contacted a relative (then incarcerated and hereafter the "Inmate") that had a gun. **HAYNES** spoke to the Inmate on a recorded jail line and told him that she needed the gun so **BRISCOE** (to whom **HAYNES** referred as her "fam" or "blood") could rob Jeffrey of her drugs. In exchange for use of the gun, **HAYNES** promised to give the Inmate "like 30 [grams]" of the stolen heroin. Specifically, **HAYNES** and the Inmate had the following conversation, in relevant part:

| HAYNES: | I need what you got, yo, and it's like something big in it for you. Like, 30 yeah. |
|---|---|
| Inmate: | What's going on though, Kiara? |
| HAYNES: | I mean I can't really talk too much but my people sitting on the cut with a hundred whatchya call 'ems and we tryna yea . . . go break bread give you 30 of 'em. |
| Inmate: | Yeah but who, I mean you got, I'm trying to get you, I'm tryna understand, who, what, where, and why. I'm just tryna understand everything before I just. . . |
| HAYNES: | It's, it's my fam. It's fam. It's blood. And, the business basically, the people, her people that she was sitting on 'em with got indicted, locked up, and she's sitting on it, and she want people to get rid of it, so n****'s just gonna take it. |
| Inmate: | Oh. So, what like, it's, it's, it's, it's it ain't, it ain't no bread, it's some other type shit? |
| HAYNES: | Boy. |
| Inmate: | That's what it is, right? |
| HAYNES: | Yeah you gonna get 30 of 'em. |
| Inmate: | Fuckin um, how fast would that be, Kiara? |
| HAYNES: | Right now. Right now, tonight. |
| Inmate: | [unintelligible] I said you gotta holler at my little brother, he prolly gotta be somewhere on standby so when you're done you can give me my bitch back, yo. |
| HAYNES: | Say that again? |
| Inmate: | I said you gotta holler at my little brother, yo, so he can be on standby so when you're done you can give me my bitch back, yo. |
| HAYNES: | Yeah, automatically, automatically, you get that back and you get that, automatically. |

After the call, **HAYNES** and **BRISCOE** met with the Inmate's brother (also a relative) who gave **HAYNES** a .45 caliber firearm. **HAYNES** and **BRISCOE** then returned to **HAYNES's** apartment. That night, **BRISCOE** left **HAYNES's** apartment to hang out with Jeffrey at Jeffrey's nearby home, located at 103 Upmanor Drive.

In the early morning hours of May 27, 2015, **HAYNES** woke up and realized **BRISCOE** had not returned to **HAYNES's** apartment. **HAYNES** grew upset. Between 4 a.m. and 5 a.m. on May 27,

12

2015, **HAYNES** walked from her apartment to Jeffrey's home and began banging on the door and yelling for **BRISCOE** to come out. Jeffrey's relative opened the door and told **HAYNES** that children were in the house asleep and that **HAYNES** should go home. **HAYNES** eventually returned to her own apartment.

**BRISCOE** walked back from Jeffrey's residence to **HAYNES's** apartment at approximately 7:23 a.m. that morning. **BRISCOE** told **HAYNES** to call Jeffrey and to apologize and smooth things over. **HAYNES** refused. **BRISCOE** told **HAYNES** that Jeffrey had shown **BRISCOE** a substantial quantity of heroin. **BRISCOE** also told **HAYNES** that the Minor Victim did not go to school that day because the Minor Victim was unwell.

At approximately 11:41 a.m., **HAYNES** overheard **BRISCOE** on the phone with Jeffrey. The two were talking about Jeffrey making breakfast for **BRISCOE**. When **BRISCOE** hung up, he went to **HAYNES's** bedroom to retrieve the .45 caliber gun and **BRISCOE** told **HAYNES** that he was going to Jeffrey's to get Jeffrey's drugs. **HAYNES** knew that when **BRISCOE** left her apartment for Jeffrey's house that **BRISCOE** intended to use the gun to obtain Jeffrey's heroin and to murder Jeffrey and the Minor Victim.

**BRISCOE** returned to **HAYNES's** apartment after the murders with the gun and a bag of heroin. When **HAYNES** asked **BRISCOE** what had happened, **BRISCOE** told **HAYNES** that Jeffrey and her son were lying dead on the kitchen floor. **BRISCOE** gave **HAYNES** a bag of heroin as her "cut" of Jeffrey's drugs. **HAYNES** called a "hack," and **BRISCOE** and **HAYNES** left **HAYNES's** apartment in the hack, dropping **BRISCOE** off at Girlfriend 1's apartment.

Later that day, **HAYNES** went to Girlfriend 1's apartment and saw **BRISCOE** in a room with several other individuals, with a scale and the bag of heroin. **HAYNES** heard the individuals tell **BRISCOE** the heroin was worth only $8,000. **BRISCOE** returned the Inmate's gun to **HAYNES**, and also gave **HAYNES** a portion of the stolen heroin to provide to **HAYNES's** relative as payment for the use of the gun. **HAYNES** later returned the gun to her relative together with the heroin **BRISCOE** had given her as payment for the gun. **HAYNES** also gave the relative some of the heroin that **BRISCOE** had given to her as part of her own "cut."

On May 28, 2015, members of the Baltimore Police Department discovered the dead bodies of Jeffrey and the Minor Victim in their home. **BRISCOE** told **HAYNES** he wanted **HAYNES** in Cambridge with him. **HAYNES** sold the remaining heroin **BRISCOE** had given her, approximately 6.4 grams, and brought the money with her to Cambridge so that she would have pocket money.

On June 5, 2015, **BRISCOE**, Co-Conspirator 2, and others were arrested following a search warrant at 502 Greenwood Avenue, Apartment 202, Cambridge, Maryland. On a recorded jail call two days later, **BRISCOE** was overheard telling Co-Conspirator 2 to tell his sister to tell **HAYNES** to get rid of her phone. **HAYNES** thereafter returned to Baltimore.

**HAYNES** was not fully truthful about the events set forth herein when she (1) met in May 2015 with detectives with the Baltimore Police Department; (2) met in February 2020 with Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives; (3) met in July 2020 with representatives of the U.S. Attorney's Office for the District of Maryland and other federal law

enforcement agents; (4) testified on July 22, 2020 in the grand jury for the District of Maryland; and (5) met in or about November 2020 with an investigator working with **BRISCOE's** defense counsel.

SO STIPULATED:

_____
Dana J. Brusca
Sandra Wilkinson
Assistant United States Attorneys

_____
Kiara Haynes
Defendant

_____
Gerald Ruter, Esq.
Counsel for Defendant

_____
Gary Proctor, Esq.
Counsel for Defendant

14